Glen E. STATON, Petitioner,

v.

**NORFOLK & WESTERN RAILWAY COMPANY, Respondent,**

**Director, Office of Workers' Compensation Programs, U.S. Department of Labor, Party–in–Interest.**

No. 94–3189.

United States Court of Appeals, Sixth Circuit.

Argued May 18, 1995.

Decided Sept. 6, 1995.

Glen E. Staton (briefed), Merritt Island, FL, pro se.

Patricia Nece, Christian P. Barber, Gary K. Stearman (argued and briefed), U.S. Department of Labor, Office of Solicitor, Washington, DC, for Director, Office of Workers' Compensation Programs, U.S. Department of Labor.

Douglas A. Smoot (briefed), Jackson & Kelly, Charleston WV, James S. Whitehead (argued), Chicago, IL, for Norfolk and Western Ry. Co.

Before: NELSON and NORRIS, Circuit Judges; BELL, District Judge.*

DAVID A. NELSON, Circuit Judge.

This is a black lung case in which the Benefits Review Board affirmed the decision of an administrative law judge denying a claim for benefits. The ALJ determined initially that the claimant qualified under 20 C.F.R. § 727.203(a) as "[a] miner who engaged in coal mine employment for at least 10 years ..." If this determination was correct, it meant that the claimant would be entitled to a presumption of total disability due to pneumoconiosis (black lung disease) if any of the five medical requirements specified in § 727.203(a) were met. But the ALJ rejected a contention that the claimant's chest x-rays established the existence of pneumoconiosis (see § 727.203(a)(1), under which the establishment of pneumoconiosis by x-ray evidence triggers the presumption), and the ALJ found that the presumption had not been triggered under any of the subsections following (a)(1) either.

Until this case reached us—as it did on an informal petition for review filed by the claimant *pro se*—the Director of the Office of Workers' Compensation Programs consistently took the position that the presumption under Part 727 of the regulations did not apply because the claimant did not have the requisite ten years of qualifying coal mine employment and because he met none of the medical requirements. The Director has now changed his position. In a brief filed in this court, the Director contends (a) that the claimant did have ten years of covered employment and (b) that the ALJ "misweighed" the x-ray evidence.

Assuming, solely for purposes of analysis, that the claimant was entitled to have his claim evaluated under Part 727 of the regulations, we conclude that the ALJ did not commit legal error in his handling of the x-ray evidence. We further conclude that, taking the record as a whole, the denial of benefits was supported by substantial evidence. We shall therefore deny the petition for review without reaching the question whether the claimant had ten years of qualifying coal mine employment.

I

The claimant, Glen E. Staton, testified at a hearing before the ALJ that he was born on June 5, 1933. (His written claim for benefits, however, showed his date of birth as May 5, 1931.) Mr. Staton said he worked in an underground coal mine for "maybe, four years," but his social security records showed only one and three-quarters years of employment by a coal mining company. After the mine was shut down, Mr. Staton went to work for the respondent in these proceedings, the Norfolk & Western Railway Company. He was employed by the railroad from 1951 to 1976, at which point he took disability retirement because of a back injury.

During the last 15 years of his tenure with the railroad, Mr. Staton testified, he worked on locomotives that pulled railroad cars to and from West Virginia coal mines. Sometimes he would pick up railroad cars that had been loaded by a coal company, and sometimes he would help load cars himself, pulling the cars through a loading tipple at the mine

---

* The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation.

site. Mr. Staton also engaged in switching operations at or near mine sites, moving cars from one track to another.

In March of 1978 Mr. Staton filed an administrative claim for black lung benefits under the Federal Coal Mine Health & Safety Act of 1969, as amended. (See *Mullins Coal Co., Inc. v. Director OWCP*, 484 U.S. 135, 138 n. 1, 108 S.Ct. 427, 429 n. 1, 98 L.Ed.2d 450 (1987), for the pertinent statutory citations.) A claims examiner denied the claim in July of 1979. Mr. Staton then engaged legal counsel, and his lawyer submitted additional supporting evidence. The claim was denied again in October of 1980, after which, through counsel, Mr. Staton requested a formal hearing before an administrative law judge. The Norfolk & Western was notified of the claim as the putative "responsible operator," whereupon the railroad sought dismissal on the grounds that (a) the company was not a coal mine operator within the contemplation of the statute and (b) Mr. Staton had not been a coal miner while employed by the railroad. The railroad also controverted liability on the ground that the claimant had not been shown to be totally disabled due to pneumoconiosis.

A claims examiner denied the railroad's request for dismissal in December of 1983. In February of 1985 the case was referred for a formal hearing. The chief administrative law judge was advised at that time that both the railroad and the Director challenged a number of the claimant's assertions, including these: that he had worked as a miner after the statute became effective in 1969; that he had worked at least ten years in or around one or more coal mines; that he suffered from pneumoconiosis; and that he was disabled due to pneumoconiosis.

The requested hearing was held before an ALJ in November of 1987. Mr. Staton appeared and testified, and he was represented by counsel throughout the hearing.

Among the documents received in evidence were reports on two x-rays of Mr. Staton's chest. One of the x-rays had been taken on September 24, 1976, and the other on April 3, 1980.

The sole report interpreting the 1976 x-ray was contained in a brief letter from a Dr. Varney, whose qualifications to interpret x-rays were not disclosed. Dr. Varney classified the x-ray as "1/1q," which would be positive for pneumoconiosis.[1]

Reports from eight different doctors were received on the 1980 x-ray. One of the reports, prepared on a Department of Labor form by a Dr. Baney, suggested radiographic findings of pneumoconiosis. Although the form contained a box in which the physician was asked to indicate whether he was a board-certified radiologist (*i.e.*, a diplomate of the American Board of Radiology) and whether he was a "B–Reader" (a radiologist who has demonstrated proficiency in assessing and classifying x-ray evidence of pneumoconiosis by successful completion of a government examination, see *Mullins*, 484 U.S. at 145 n. 16, 108 S.Ct. at 433 n. 16), Dr. Baney did not indicate that he was either board-certified or a B–Reader.

The remaining seven reports were all prepared by doctors who were not only certified by the American Board of Radiology[2] but were B–Readers as well. Six of these seven experts—all six of whom were retained by the railroad—read the x-ray as failing to establish the existence of pneumoconiosis. Only one—a Dr. Cole, who was retained by the claimant—read the x-ray as positive for pneumoconiosis.

Rejecting the contention that railroad employees cannot be coal miners, and concluding that Mr. Staton's last 15 years of employment by the Norfolk & Western qualified as coal mine work covered by the statute, the ALJ credited Staton with more than 16 years

1. A chest x-ray classified as 1/1 is accepted as evidence of pneumoconiosis under the regulations, but an x-ray classified as o/o or o/1 is not. 20 C.F.R. § 410.428(a)(1).

2. The ALJ was under the impression that one of these physicians, a Dr. Wiot—identified in his *curriculum vitae* as the Chairman of the Department of Radiology at the University of Cincinnati Medical Center—was a B–Reader only. In fact, as the *curriculum vitae* showed, Dr. Wiot had been a diplomate of the American Board of Radiology since 1959 and had served on the Board's executive committee since 1978.

as a coal miner. The timing of the claim was not such as to require evaluation under another part of the regulations, and the ALJ applied Part 727. As indicated above, the ALJ found that the medical evidence was not sufficient to invoke the assumption of disability under § 727.203(a)(1), and Mr. Staton was held not to be entitled to benefits.

The Benefits Review Board did not disagree with the ALJ's assessment of the x-ray evidence. The Board declared itself dissatisfied with the ALJ's treatment of the question whether the particular railroad work described by Mr. Staton constituted qualifying employment, however, and the case was remanded for further proceedings.

On remand, the ALJ decided that Mr. Staton did not in fact have ten years of coal mine employment and was not entitled to have his claim considered under Part 727 of the regulations. Proceeding to analyze the claim under Part 718 instead, the ALJ concluded that Staton was not entitled to benefits under that part. The decision was affirmed by the Board on December 30, 1993, and the petition to this court followed. Mr. Staton is no longer represented by counsel, and his *pro se* brief does not address the issue we find dispositive, but the arguments in his favor have been ably articulated by the Director.

II

Whether the black lung legislation can apply to railroad workers employed in the vicinity of coal mines is an open question in our circuit. In *Louisville & Nashville Railroad Co. v. Donovan,* 713 F.2d 1243 (6th Cir.1983), *cert. denied,* 466 U.S. 936, 104 S.Ct. 1908, 80 L.Ed.2d 457 (1984), we refrained from "making any definitive construction" of the legislation in this regard. *Id.* at 1249. We likewise find it unnecessary to reach the question here. Assuming *arguendo* that Mr. Staton was working as a "miner" during his last years of employment by the Norfolk & Western—an assumption that would give him the benefit of the § 727.203(a) presumption if one of the specified medical requirements were met—we cannot fault the agency's determination that none of the medical requirements was met.

The only such requirement as to which there can be any serious question is that set forth in § 727.203(a)(1): "A chest roentgenogram (x-ray), biopsy, or autopsy establishes the existence of pneumoconiosis (see § 410.428 of this title)." In addressing this subsection, the ALJ expressed himself as follows:

"Dr. Frank T. Varney, read an x-ray from September 24, 1976 as 1/1p. A second x-ray was taken on April 3, 1980. This x-ray was read as follows:

| EXHIBIT | X-RAY DATE | REPORT DATE | PHYSICIAN AND QUALIFICATIONS | IMPRESSION |
|---------|------------|-------------|------------------------------|------------|
| DX–15 | 4–3–80 | 6–23–80 | Cole B reader, BCR | 1/1 q |
| DX–16 | 4–3–80 | 4–3–80 | Baney | 2/2 q |
| EEX–2 | 4–3–80 | 10–8–87 | Wheeler B reader BCR | 0/1 pq |
| EEX–2 | 4–3–80 | 10–8–87 | Saba B reader BCR | 0/1 |
| EEX–2 | 4–3–80 | 10–8–87 | Scott B reader BCR | 0/1 pq |
| EEX–1 | 4–3–80 | 6–20–85 | Spitz B reader BCR | Negative |
| EEX–1 | 4–3–80 | 3–8–85 | Wiot B reader | Negative |
| EEX–8 | 4–3–80 | 4–23–85 | Felson B reader BCR | No Pneumoconiosis |

Since there were six negative readings by B readers/Board-certified radiologists, as opposed to one positive reading by a B reader/Board-certified radiologist, I find that the weight of the x-ray evidence does not establish invocation under (a)(1)."

Citing *Woodward v. Director, OWCP,* 991 F.2d 314 (6th Cir.1993), the Director challenges this finding on two grounds. First, he contends, the ALJ accorded greater weight to the most recent x-ray, which is impermissible when the later evidence is negative. Second, the Director argues, the ALJ com-

mitted legal error in relying solely on the "quantitative weight" of the x-ray evidence. We do not find either contention persuasive.

In the *Woodward* case, the claimant's chest had been x-rayed a total of eight times. The first three x-rays, taken between 1975 and 1980, had been read by five different doctors, four of whom interpreted the films as positive for pneumoconiosis. Of the remaining x-rays, taken between 1985 and 1987, one had been read as positive and all of the other four had been read as negative by most or all of the numerous doctors interpreting them.

The ALJ who was confronted with this evidence in *Woodward* specifically stated that he would not consider the three x-rays taken between 1975 and 1980. His reason for excluding the earlier x-rays from consideration was that "pneumoconiosis is a progressive disease;" in light of this, he said, "more weight may be afforded the more recent x-rays." *Woodward,* 991 F.2d at 316. The ALJ's reasoning, as the *Woodward* court recognized, did not make much sense.

If pneumoconiosis is a progressive disease, "early negative x-ray readings are not inconsistent with significant later positive readings...." *Id.* at 318, quoting *Mullins,* 484 U.S. at 151, 108 S.Ct. at 436. While it may be appropriate to give greater weight to significantly later positive readings, therefore, the *Woodward* court held that it was legal error to exclude earlier positive readings from consideration and to rely solely on largely negative readings of x-rays taken later. *Id.* at 320.

■ In the case at bar, the ALJ made no corresponding error in evaluating the x-ray evidence under § 727.203(a)(1). The ALJ did not exclude from consideration Dr. Varney's reading of the earlier x-ray, and he did not give greater weight to the positive readings of the other x-ray simply because the x-ray was taken later. Instead, the ALJ gave consideration to the entire universe of readings—nine in number—and accorded greater weight to the readings made by B-read-

ers/Board-certified radiologists. This did not constitute legal error under *Woodward,* and it was entirely consistent with the approach endorsed by this court in *Fife v. Director, OWCP,* 888 F.2d 365 (6th Cir.1989). (In *Fife* there were seven x-ray readings, four of which—including two readings by B-readers—were negative. None of the three positive readings was by a B-reader. The ALJ found the x-ray evidence did not establish the existence of pneumoconiosis, and we upheld the ALJ's findings.)

■ The Director's contention that the ALJ committed legal error in this case by relying solely on the "quantitative weight" of the x-ray evidence is also wide of the mark. *Woodward* teaches that administrative factfinders must not rely solely on the *quantity* of readings on one side or the other, "without reference to a difference in the *qualifications* of the readers or without an examination of the party affiliations of the experts." *Woodward,* 991 F.2d at 321 (emphasis supplied).[3] The *Woodward* opinion also points out that the Administrative Procedure Act directs agencies to provide for the exclusion of "unduly repetitious evidence," among other things, see 5 U.S.C. § 556(a), and the opinion suggests that it can be error for an administrative factfinder to let himself be swayed by unduly repetitious evidence. *Id.* No such error occurred here.

The six x-ray readings offered by the Norfolk & Western were not unduly repetitious, and Mr. Staton's lawyer never contended otherwise at the hearing before the ALJ. As the railroad's exhibits were offered, on the contrary, counsel stated on the record that he had no objection to their being received. The ALJ could hardly have refused to consider the railroad's x-ray evidence.

And, as we have seen, this was not a case in which the ALJ violated *Woodward* 's stricture against considering "the quantity of evidence alone, without reference to a difference in the qualifications of the readers...." Here the ALJ pointed out, after naming all nine of the doctors who had made readings, that "there were six negative readings by B-

---

**3.** The *Woodward* court referred in *dicta* to "certain policy flaws" in a system under which each side pays 100 percent of the fees of its own

experts; the court urged that litigants agree on a predetermined number of experts and share the cost of retaining them. *Id.*

readers/Board-certified radiologists, as opposed to one positive reading by a B-reader/Board-certified radiologist. . . ." The ALJ clearly considered the quantity of the evidence in light of the difference in the qualifications of the readers, which is precisely what *Woodward* suggests that he should have done.

The denial of Mr. Staton's claim for benefits was supported by substantial evidence and was not tainted by legal error on the part of the ALJ. The petition for review is **DENIED**.