**Harold McCAIN, Petitioner–Appellant,**

v.

**DIRECTOR, OFFICE OF WORKERS COMPENSATION PROGRAMS**
Respondent–Appellee.

No. 01–4074.

United States Court of Appeals, Sixth Circuit.

March 6, 2003.

Before NELSON and CLAY, Circuit Judges; and HAYNES, District Judge.*

OPINION

HAYNES, District Judge.

Petitioner Harold McCain appeals the United States Department of Labor

---

* The Honorable William J. Haynes, Jr., United States District Judge for the Middle District of Tennessee, sitting by designation.

("DOL") Benefits Review Board's Decision and Order, affirming the Decision and Order on Remand of the Administrative Law Judge ("ALJ"), denying Petitioner's claim for benefits filed under Title IV of the Federal Coal Mine Health & Safety Act, as amended, 30 U.S.C. §§ 901–945. Petitioner contends on appeal that the ALJ improperly rejected the opinion of Petitioner's treating physician who was board certified in pulmonary medicine and the objective medical evidence that Petitioner's pulmonary illness was due, in part, to coal dust exposure. The ALJ credited the opinions of two physicians of unknown credentials who concluded that Petitioner's impairment was due entirely to his smoking history. Petitioner contends that the ALJ erred in not giving controlling weight to the treating physician's opinion as required under *Tussey v. Island Creek Coal Co.*, 982 F.2d 1036 (6th Cir.1993). For the reasons set forth below, we conclude that there was not substantial evidence in the record contradicting the treating physician's opinion and, therefore, that opinion should have been given greater weight than the DOL physicians' opinions. Thus, we REVERSE the judgment of the Benefits Review Board and AWARD benefits to Petitioner.

## I. BACKGROUND

1. *Procedural History*

Petitioner filed his application for benefits under the Black Lung Benefits Act ("BLBA").[2] 30 U.S.C. §§ 901–945, on January 12, 1994. On June 14, 1994, the district director initially denied Petitioner's claim on grounds that the evidence was insufficient to demonstrate that he suf-

fered from pneumoconiosis or was totally disabled. In a letter dated June 13, 1995, Petitioner, through his counsel, requested modification of the district director's denial pursuant to Section 22 of the Longshore and Harbor Workers' Compensation Act ("LHWCA"), 33 U.S.C. § 922, as incorporated in the Federal Coal Mine Health & Safety Act ("the Act") by 30 U.S.C. § 932(a). Petitioner submitted additional evidence in support of his request for modification. The district director denied the request for modification later that month and, following an informal conference, the district director again denied benefits on grounds that the evidence failed to show that Petitioner suffered from pneumoconiosis or that he was totally disabled.

Petitioner again wrote a letter expressing disagreement with the denial of benefits that the district director accepted as a timely modification request. Accordingly, the case was referred to the Office of Administrative Law Judges ("OALJ") for a formal hearing. Before that hearing, an ALJ remanded the claim to the district director for further evidentiary development.

On remand, after reviewing the results of a DOL sponsored examination, the district director again denied benefits on the same grounds. In response, Petitioner submitted a March 26, 1997 letter from his treating physician, Dr. Felipe Rubio. Construing the letter as another request for modification, the district director again denied the claim.

Petitioner then requested a hearing, and the district director again referred the claim to the ALJ, who held a formal hearing. After the hearing, the ALJ issued a

2. BLBA references Title IV of the Federal Coal Mine Health and Safety Act as amended by the Black Lung Benefits Act of 1972, the Federal Mine Safety and Health Amendments Act of 1977, the Black Lung Benefits Reform Act of 1977, the Black Lung Benefits Revenue Act of 1977, the Black Lung Benefits Amendments of 1981, and the Black Lung Benefits Revenue Act of 1981.

decision denying benefits. finding the medical evidence in the record insufficient to establish the existence of pneumoconiosis. *See generally* 20 C.F.R. § 718.202(a)(1)-(4) (1999) (describing the four methods of establishing pneumoconiosis). In this decision, the ALJ credited Petitioner with a forty-nine-and-one-half "pack years" of smoking and four years of coal mine employment,[3] although Petitioner testified that he worked for a total of ten years.[4]

Although the ALJ found that Petitioner suffered from a totally disabling respiratory or pulmonary impairment, the ALJ rejected the opinion of Petitioner's treating physician that Petitioner's pulmonary illness was due to both an obstructive impairment caused by smoking and a restrictive impairment caused by coal dust exposure. The ALJ concluded that Petitioner's treating physician failed to provide an adequate basis for his conclusion. The ALJ credited the opinions of two DOL physicians who examined Petitioner and concluded that Petitioner's respiratory impairment was due entirely to his previous smoking history.

Petitioner filed a timely appeal to the Benefits Review Board of the United States Department of Labor ("the Board"), which affirmed in part and vacated in part the ALJ's decision and remanded the case to the ALJ for reconsideration of the evidence. The Board affirmed the ALJ's decision to credit Petitioner with four years of coal mine employment, but because the ALJ did not provide a valid basis for discounting Petitioner's treating physician's opinion, the Board vacated the ALJ's determination that the medical evidence was insufficient to establish the existence of pneumoconiosis. The Board affirmed, as unchallenged on appeal, the ALJ's finding that Petitioner suffered from a totally disabling respiratory or pulmonary impairment. In its remand order, the Board instructed the ALJ (1) to assess initially whether the treating physician's opinion was reasoned; and, if so, (2) to consider the physician's status as Petitioner's treating physician when weighing the conflicting medical opinions of record.

On remand, after the submission of additional evidence from Petitioner's treating physician, the ALJ again denied benefits. In reviewing the evidence, the ALJ noted that Petitioner's x-ray was negative for pneumoconiosis and that the treating physician's interpretation of the pulmonary function studies concluded that Petitioner had an obstructive impairment, but made no reference to a restrictive impairment. The ALJ concluded that the treating physician's December 1997 letter in support of Petitioner's claim was inconsistent with these earlier interpretations of the pulmonary function studies. Additionally, the

---

**3.** The ALJ relied upon Petitioner's Social Security Administration ("SSA") earnings statement to credit him with three years and four months of coal mine employment between 1947 and 1953. The ALJ also credited Petitioner with eight months of coal mine employment in 1947, not reflected on his SSA earnings statement, based upon Petitioner's testimony that his employer did not withhold SSA taxes during that period because Petitioner was under eighteen years of age.

**4.** Petitioner provided testimony and evidence that he was employed as a coal miner for a total of ten years asserting that he mined his father's house coal for periods not reflected in the SSA earnings statement. The ALJ found that the evidence in support of Petitioner's assertion that he worked ten years as a coal miner was contradictory and inconsistent with Petitioner's own testimony. The ALJ's decision to credit Petitioner with four years of coal mine employment was affirmed by the Benefits Review Board in its October 29, 1999 decision.

ALJ found that the treating physician's opinion was equivocal and was not based on any specified smoking history or the proper coal mine employment history.

Having rejected the treating physician's opinion because of alleged flaws in its reasoning, the ALJ determined that the treating physician's opinion was not entitled to special deference. The ALJ then accepted the contrary opinions of the DOL physicians whose opinions the ALJ characterized as well-reasoned and properly documented. Therefore, the ALJ concluded that Petitioner failed to prove the existence of pneumoconiosis by a preponderance of the medical opinion evidence and failed to prove that Petitioner's disability was due, at least in part, to his pneumoconiosis.

Petitioner timely appealed the denial to the Board, which affirmed the ALJ's denial of benefits. The Board held that the ALJ permissibly questioned the consistency of the treating physician's opinions and that the ALJ acted within his discretion as fact-finder in concluding that the physician's opinion was too equivocal to support a determination of pneumoconiosis.

Although the Board held that the ALJ had failed to consider adequately Petitioner's argument that the opinions of the DOL's physicians were insufficiently reasoned, the Board determined that this was harmless error because the opinions did not assist Petitioner in establishing the existence of pneumoconiosis. Because Petitioner's failure to prove the existence of pneumoconiosis precluded an award of benefits, the Board declined to review the ALJ's alternative determination that the evidence was insufficient to establish a causal link between Petitioner's impairment and pneumoconiosis. Petitioner now seeks review of the decisions below.

## 2. Factual Record

The pertinent issues presented by this appeal concern: (1) the reports of the three physicians offering opinions as to whether Petitioner suffers from pneumoconiosis; (2) the state of the record with respect to their credentials; (3) whether the physicians' opinions are well-reasoned and adequately documented; and (4) whether the medical opinion evidence persuasively links Petitioner's disabling impairment with his coal mine employment. The record in this action contains two reports from Drs. Fritzhand and Burton, who examined Petitioner on behalf of the DOL in 1994 and 1996. respectively. In addition, the record contains a series of letters and medical records provided by Dr. Rubio, Petitioner's treating physician.

*Dr. Rubio.* Dr. Felipe Rubio's curriculum vitae establishes that he is board certified in both internal medicine and the subspeciality of pulmonary medicine. Dr. Rubio had been Petitioner's treating physician since 1993 and had examined Petitioner several times over the seven year period as evidenced by pulmonary function tests, correspondences and treatment notes contained in the record. Dr. Rubio concluded that Petitioner had obstructive lung disease with a restrictive component that he opined was characteristic of pneumoconiosis.

Dr. Rubio administered pulmonary function testing on December 28, 1993 and October 6, 1994. In the December 28, 1993 report, Dr. Rubio stated that the study produced severely reduced values. After noting that the lung volumes showed marked hyperinflation, he stated that the study showed a "severe obstructive ventilatory defect." (J.A. at 90). On the October 6, 1994 pulmonary function study. Dr. Rubio stated that Petitioner's FVC was moderately decreased and his $FEV_1$ was

severely decreased.[5] The physician also remarked that the "mid flows show marked hyperinflation." (J.A. at 79). Dr. Rubio again concluded that the study evidenced a "severe obstructive ventilatory defect." *Id.*

The reports from both pulmonary function studies also included notations concerning Petitioner's status as a former smoker. Specifically, the December 28, 1993 report stated that Petitioner had smoked one pack of cigarettes per day for forty years and had ceased smoking twelve years earlier. The later report stated that Petitioner had smoked two packs of cigarettes per day for forty-seven years and had quit smoking fourteen years earlier.

Dr. Rubio's correspondences from September 1993 to May 1995 were addressed to Petitioner's other physicians and primarily discussed the state of Petitioner's health and Dr. Rubio's treatment of Petitioner's lung condition. Dr. Rubio's later correspondences were addressed to Petitioner's legal counsel and DOL claims examiners, and chiefly considered the source of Petitioner's respiratory disease.

In a September 29, 1993 letter addressed to Dr. Gilbert Templeton. Dr. Rubio observed that Petitioner had recently undergone coronary artery bypass grafting and had a very well-documented history of pneumoconiosis and chronic obstructive pulmonary disease ("COPD").

On November 24, 1993. Dr. Rubio's partner in practice. Dr. Hemant Shah, wrote to Dr. Jeffery Hoffman concerning the treatment of Petitioner. In the November letter. Dr. Shah stated his impression as severe COPD with pneumoconiosis. He also noted that Petitioner's "preop $FEV_1$ was only 1.09 and the ratio of $FEV_1/FVC$ was 41%."[6] (J.A. at 67). In a December letter. Dr. Rubio gave his diagnoses as COPD, pneumoconiosis, and "history of previous cardiac artery bypass grafting." (J.A. at 66).

In an letter dated October 6, 1994, Dr. Rubio wrote to Dr. Steven Fessler concerning Petitioner's health. Dr. Rubio observed that he had been treating Petitioner for COPD and pneumoconiosis. Dr. Rubio stated that his impressions included "COPD with history of pneumoconiosis with an $FEV_1$ of 1.09 or 35% with marked air trapping" and arteriosclerotic heart disease. (J.A. at 64). On May 17, 1995, Dr. Rubio wrote to Dr. Templeton again noting that Petitioner was being treated for COPD and pneumoconiosis. The doctor's impression was "COPD with an $FEV_1$ of a liter or 35% with significant hyperinflation with decreased diffusion capacity."[7] (J.A. at 63).

Later that year, Dr. Rubio authored the first of a series of letters addressing whether Petitioner's lung condition was

5. FVC is the forced vital capacity. *See* 20 C.F.R. §§ 718.103(a), 718.4. "The FEV measures in liters the volume of air which can be forcibly expelled from the lungs after maximum effort over a period of one second." Solomons, A Critical Analysis of the Legislative History Surrounding the Black Lung Interim Presumption and a Survey of Its Unresolved Issues, 83 W.Va.L.Rev. 869, 879 n. 33 (1981) (hereinafter Solomons); *see also* 20 C.F.R. §§ 718.103(a), 718.4.

6. The predicted $FEV_1$ value for a man of Petitioner's age and height, 65 years old and 68 inches in height, is 1.82. 20 C.F.R. § 718 App. B.

7. Diffusion capacity measures the rate of transfer of gas from the lungs (alveoli) to the blood vessel (capillary). Testing the diffusion capacity (also called the DLCO) permits an estimate of how efficiently the lungs are able to transfer oxygen from the air into the bloodstream. Calculating diffusion capacity involves corrections for several variables: hemoglobin, lung volume, V/Q mismatch, pulmonary capillary bed and alveolar capillary membrane thickness.

related to his employment as a coal miner. On a preprinted form dated September 5, 1995, Dr. Rubio circled "Yes" in response to three questions: (1) whether Petitioner had pneumoconiosis; (2) whether the pneumoconiosis was due to his exposure to coal dust while a coal miner; and (3) whether he was totally disabled from returning to a job in the coal mines. In a follow up letter dated November 9, 1995, Dr. Rubio explained that he primarily based his finding of pneumoconiosis upon "pulmonary function criteria." (J.A. at 60). The physician explained that Petitioner had a "significant restrictive component which would certainly go with pneumoconiosis rather that COPD." *Id.* Dr. Rubio further commented that "there is no evidence of hyperinflation" and "his exposure is adequate and prolonged enough to justify the clinical diagnosis." *Id.* Acknowledging that Petitioner's x-ray did not show a "reticular nodular pattern." he stated that this was a case of "pure fibrosis." *Id.*

Dr. Rubio reiterated those findings in a letter dated January 4, 1996. Addressing the effect of smoking on Petitioner's respiratory condition. Dr. Rubio remarked that while Petitioner did smoke in the past, restrictive patterns were nevertheless more commonly seen in cases of pneumoconiosis, rather than obstructive pulmonary diseases.

In a September 5, 1996 letter, Dr. Rubio addressed Petitioner's history of coal mine employment. Dr. Rubio stated that Petitioner had a clear history of working in the mines from 1944 through 1953, plus an additional eight months. Dr. Rubio further commented that although Petitioner suffered from other illnesses, he believed that pneumoconiosis was the main source of his "shortness of breath." (J.A. at 57).

The following year, Dr. Rubio wrote to a DOL claims examiner, expressing his disagreement with the district director's determination that Petitioner was not entitled to benefits. In that letter, dated March 26, 1997, Dr. Rubio stated that there was sufficient evidence of "physiologic impairment and historical background to justify his disability based on pneumoconiosis." (J.A. at 56). Dr. Rubio further remarked that Petitioner had suffered "no other significant pulmonary insult during his lifetime to merit the number on his pulmonary function test." *Id.*

In a letter dated December 15, 1997, Dr. Rubio again opined that Petitioner suffered from disabling pneumoconiosis arising from his coal mine employment. Relying on a nine year coal mine exposure history, Dr. Rubio stated that Petitioner "has had a significant problem with restrictive lung disease and obstructive disease" and "a restrictive component with severe decrease in the diffusion capacity which would be more with a fibrotic illness rather than a obstructive illness." (J.A. at 54). Dr. Rubio then commented:

It is my professional opinion based on [Petitioner's] history of exposure, and based on his pulmonary function and his chest x-ray that this patient in fact has suffered long term harmful effect[s] from his history of mining during the years 1944 to 1953. I do realize that there have been many other conditions relating to this case and I have had the opportunity to read some of the explanations and I do not concur that all of his problems are related to tobacco or nicotine abuse.

*Id.* Dr. Rubio estimated that Petitioner's coal mine employment was responsible for "approximately 50% or greater of his current disability." *Id.*

Finally, Dr. Rubio again defended his opinion that Petitioner's coal mine employment contributed to his lung condition in a letter to Petitioner's counsel dated March 1, 2000. In this letter, Dr. Rubio asserted:

Even though [Petitioner] worked in the coal mines legally for 4 years it should be noted that he did work an additional 5 years for his father before he was officially under Social Security and Medicare system. Therefore his insult [due] to coal dust was longer than the 4 years and even if it was 4 years he still could have suffered during that time sufficient insult to result in the current impairment that I described in my previous letter.

(J.A. at 53).

*Dr. Fritzhand.*[8] Dr. Martin Fritzhand examined Petitioner on March 3, 1994. The doctor reported that Petitioner smoked one to two packs of cigarettes per day from 1947 until 1980. In examining Petitioner, Dr. Fritzhand reviewed Petitioner's chest x-ray, vent studies,[9] arterial blood gas and electrocardiogram. The doctor observed that the x-ray was negative for pneumoconiosis and that the vent study showed moderately severe combined airway disease. Dr. Fritzhand diagnosed COPD caused by Petitioner's cigarette smoking. He stated that the impairment would prevent Petitioner from returning to coal mine employment. It is unclear whether Dr. Fritzhand was aware of Petitioner's specific coal mine employment history although he credits Petitioner with five years of underground coal mine employment.[10]

*Dr. Burton.*[11] Dr. George Burton examined Petitioner on November 13, 1996. The doctor noted that Petitioner smoked one-and-one-half packs of cigarettes per day from 1947 until 1981. In his examination of Petitioner, Dr. Burton reviewed a chest x-ray, vent study, and arterial blood gas. The doctor observed that the chest x-ray showed moderate obstructive pulmonary disease, the vent study showed pulmonary hyperexpansion, and the blood gas showed mild exercise desaturation. Dr. Burton diagnosed COPD due to smoking and arteriosclerotic heart disease due to "lifestyle" and "heredity." (J.A. at 72). In addition, the doctor stated that Petitioner suffered from a moderate impairment that would prevent him from returning to his coal mine employment.

## II. ANALYSIS

### 1. Standard of Review

The BLBA, 30 U.S.C. §§ 901–945 (1982), incorporates by reference the procedures

---

8. No curriculum vitae was entered into the record, however, Petitioner's brief states that Dr. Fritzhand's only Board certification is in urology.

9. Although Dr. Fritzhand examined vent studies from March 3, 1994 and May 11, 1994, the record reflects that these vent studies were not acceptable ("Test does not meet the technical quality standards applicable at the time the evidence was submitted."). (J.A. at 39, 86). A form, submitted by Dr. Sarah Long notes that the vents were not acceptable because of "[l]ess than optimal effort, cooperation and comprehension." J.A. at 86. Dr. Long noted that "the MVV is greater than would be expected based on the $FEV_1$ value and this raises a question as to the effort on the $FEV_1$ and FVC." J.A. at 39. "The MVV or MBC measures, in liters, the total volume of air expelled over a period of one minute during repetitive maximal respiratory effort." Solomons, *supra*, 83 W.Va.L.Rev. at 879 n. 34. "Qualifying" pulmonary function studies and arterial blood gas studies are those which meet the prescribed regulatory criteria for establishing presumptive total respiratory disability set forth at 20 C.F.R. §§ 718.204(c)(2) and Appendix C. *See Mullins Coal Co. v. Dir., OWCP*, 484 U.S. 135, 144 n. 14, 108 S.Ct. 427, 98 L.Ed.2d 450 (1987); *Slusher v. Dir., OWCP*, 983 F.2d 1068 (6th Cir.1992).

10. Dr. Fritzhand did check the box on the examination form indicating that an employment history form is attached, but this form does not appear in the record. (J.A. at 73).

11. No curriculum vitae was entered into the record for Dr. Burton.

for review of claims under the Longshore and Harbor Workers' Compensation Act ("LHWCA"). 30 U.S.C. § 932(a) (1982), *incorporating* 33 U.S.C. § 921(c)(1982). Although the statute does not set forth the standard of review in the court of appeals, case law has established that we have a "very narrow scope of review over the Board's decisions which must be affirmed unless the Board has committed legal error or exceeded its scope of review of the ALJ's findings." *Peabody Coal Co. v. Groves,* 277 F.3d 829, 833 (6th Cir.2002) (citing *Tennessee Consol. Coal Co. v. Kirk,* 264 F.3d 602, 606 (6th Cir.2001)).

The ALJ's findings are conclusive if they are supported by substantial evidence and are in accordance with the applicable law. *Kirk,* 264 F.3d at 606. The Supreme Court has defined substantial evidence as more than a "scintilla of evidence." or the amount of evidence that a reasonable mind might accept as adequately supporting a conclusion. *Richardson v. Perales,* 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). "The Board is not empowered to engage in *de novo* review of the record ... and may not set aside an inference [made by the ALJ] merely because it finds the opposite one more reasonable." *Bizzarri v. Consolidation Coal Co.,* 775 F.2d 751, 753 (6th Cir.1985) (citing *Moore v. Califano,* 633 F.2d 727, 729 (6th Cir.1980)).

"When the question is whether the ALJ reached the correct result after weighing conflicting medical evidence, 'our scope of review ... is [again] exceedingly narrow. Absent an error of law, findings of facts and conclusions flowing therefrom must be affirmed [by this Court] if supported by substantial evidence,'" even if the facts permit an alternative conclusion. *Consolidation Coal Co. v. Worrell,* 27 F.3d 227, 230–31 (6th Cir.1994) (citation omitted); *Youghiogheny & Ohio Coal Co. v. Webb,* 49 F.3d 244, 245 (6th Cir.1995). We should

not re-weigh the evidence or substitute our judgment for that of the ALJ, *see Gray v. SLC Coal Co.,* 176 F.3d 382, 387 (6th Cir. 1999); *Wiley v. Consolidation Coal Co.,* 892 F.2d 498, 500 (6th Cir.1989), except to determine if substantial evidence supports the Board's and the ALJ's decisions.

2. Historical Background of the Federal Coal Mine Health and Safety Act of 1969 and Petitioner's Claim for Benefits Under this Act

Congress first enacted the Federal Coal Mine Health and Safety Act in 1969, and later passed amendments contained in the Federal Mine Safety and Health Amendments of 1977 in an effort to improve working conditions and safety in the nation's mines. 30 U.S.C. §§ 801 *et seq.* as amended by 30 U.S.C. §§ 901–945 (1976, Supp. I 1977 and Supp. II 1978). Additionally. Congress established a compensation program to provide benefits to disabled miners and survivors of deceased miners if the miner was disabled or killed by coal workers' pneumoconiosis, an occupational disease commonly known as "black lung." Congress command is reflected in 20 C.F.R.'s 718.2(c):

> In enacting Title IV of the Act, Congress intended that claimants be given the benefit of all reasonable doubt as to the existence of total or partial disability or death due to pneumoconiosis. This part shall be construed and applied in that spirit and is designed to reflect that intent.

As we stated in *Southard v. Director, OWCP,* 732 F.2d 66 (6th Cir.1984), "[t]he Act is remedial in nature, and it must be liberally construed to include the largest number of miners as benefit recipients." 732 F.2d at 71. We recognize that the Act "was enacted in order to facilitate and liberalize the flow of compensation to miners who acquire pneumoconiosis as a result

of working in coal mines." *Wiley*, 892 F.2d at 503; *Youghiogheny*, 49 F.3d at 247.

Petitioner filed his claim for benefits after March 31, 1980; therefore, his entitlement to benefits is governed by 20 C.F.R. § 718, which contains the Act's implementing regulations for all claims filed after March 31, 1980. *See Saginaw Mining Co. v. Ferda,* 879 F.2d 198, 204 (6th Cir.1989). To receive benefits, Petitioner must show by a preponderance of the evidence that (1) he has pneumoconiosis, (2) his pneumoconiosis arose out of his coal mine employment, and (3) he is totally disabled as a result. *See* 20 C.F.R. §§ 718.202, 718.203, 718.204.

Under the BLBA, the term "pneumoconiosis" is defined as "a chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment." 30 U.S.C. §§ 902(b). The regulations further clarify that "[f]or purposes of this definition, a disease 'arising out of coal mine employment' includes any chronic pulmonary disease resulting in respiratory or pulmonary impairment significantly related to, or substantially aggravated by, dust exposure in coal mine employment." 20 C.F.R. §§ 718.201. This "legal" definition of pneumoconiosis "encompasses a wider range of afflictions than does the more restrictive medical definition of pneumoconiosis." *Kline v. Dir., OWCP,* 877 F.2d 1175, 1178 (3d Cir.1989).

The Act provides Petitioner four ways to demonstrate that he has "legal" pneumoconiosis: (1) chest X-ray; (2) biopsy or autopsy; (3) by applying certain enumerated presumptions; and, (4) notwithstanding a negative Xray, by a physician's diagnosis, if it is supported by a reasoned medical opinion. 20 C.F.R. §§ 718.202(a)(1)-(4).[12]

The ALJ found, and the Board affirmed, that Petitioner failed to establish either that he suffered from coal workers' pneumoconiosis or that his disability was caused by pneumoconiosis. Petitioner challenges the ALJ's finding that he did not establish pneumoconiosis related to his coal mine employment under 20 C.F.R. § 718.202(a)(4). That regulation reads, in its entirety, as follows:

A determination of the existence of pneumoconiosis may also be made if a physician, exercising sound medical judgment, notwithstanding a negative Xray, finds that the miner suffers or suffered from pneumoconiosis as defined in §§ 718.201. Any such finding shall be based on objective medical evidence such as blood-gas studies, electrocardiograms, pulmonary function studies, physical performance tests, physical examination, and medical and work histories. Such a finding shall be supported by a reasoned medical opinion.

20 C.F.R. §§ 718.202(a)(4).

In considering Petitioner's proof under this regulation, the ALJ credited as "well-reasoned" the opinions of Drs. Burton and Fritzhand, that Petitioner did not suffer from pneumoconiosis, he ALJ roundly rejected the contrary opinion of Dr. Rubio, thus concluding that Petitioner failed to demonstrate that he had pneumoconiosis under the regulation.

In *Tussey,* we confirmed that the "opinions of treating physicians are entitled to greater weight than those of non-treating

---

12. Section 718.202(a)(3) is unavailable to Petitioner because the presumptions in §§ 718.304, 718.305, and 718.306 do not apply to the facts here as stated above. Section 718.202(a)(2) is also inapplicable because biopsy or autopsy results are not in this record These determinations, made by the ALJ in his May 29, 1998 decision, are not disputed by either party on appeal.

physicians." 982 F.2d at 1042; *see also Groves,* 277 F.3d at 834. However, we did not suggest that treating physicians should automatically be presumed to be correct, but their opinions should be "properly credited and weighed." *Id.* The ALJ must have a medical reason for preferring one physician's conclusion over another's. Yet, as we stated in *Darland v. Fortis Benefits Ins. Co.,* 317 F.3d 516 (6th Cir.2003), when applying the treating physician rule, the trial court should defer to the opinions of the plaintiff's treating physicians, absent "substantial evidence" in the record contradicting those opinions.

In determining the level of deference, we turn for guidance to 20 C.F.R. §§ 718.104(d)(5), which delineates the criteria for the development of medical evidence in black lung proceedings:

> In appropriate cases, the relationship between the miner and his treating physician may constitute substantial evidence in support of the adjudication officer's decision to give that physician's opinion controlling weight, provided that the weight given to the opinion of a miner's treating physician shall also be based on the credibility of the physician's opinion in light of its reasoning and documentation, other relevant evidence and the record as a whole.

*Id.; see also Groves,* 277 F.3d at 834.

3. The Treating Physician's Opinion

Determinations of whether a physician's report is sufficiently documented and reasoned under section 727.203(a)(4) is a matter of credibility left to the trier of fact. *Moseley v. Peabody Coal Co.,* 769 F.2d 357, 360 (6th Cir.1985) (citing *Dir., OWCP v. Rowe,* 710 F.2d 251 (6th Cir.1983)). The ALJ is not bound to accept the opinion or theory of any medical expert, but may weigh the evidence and draw his own inferences. *Underwood v. Elkay Mining,*

*Inc.,* 105 F.3d 946, 951 (4th Cir.1997) ("In weighing opinions, the ALJ is called upon to consider their quality," taking into account, among other things, "the opinions' reasoning" and "detail of analysis."); *Risher v. OWCP,* 940 F.2d 327, 331 (8th Cir. 1991) ("An ALJ may disregard a medical opinion that does not adequately explain the basis for its conclusion."); *White v. Newport News Shipbuilding & Dry Dock Co.,* 633 F.2d 1070, 1075 (4th Cir.1980) (noting that the ALJ may weigh the medical evidence and draw his own conclusions). Moreover, the ALJ should reject as insufficiently reasoned any medical opinion that reaches a conclusion contrary to objective clinical evidence without explanation. *Phillips v. Dir., OWCP,* 768 F.2d 982, 984–85 (8th Cir.1985). *See generally Peabody Coal Co. v. Dir., OWCP,* 778 F.2d 358, 362–63 (7th Cir.1985).

In weighing medical evidence to evaluate the reasoning and credibility of a medical expert, however, the ALJ may not exercise "absolute discretion to credit and discredit the expert's medical evidence." *Id.* at 362. "By independently reviewing and interpreting the laboratory reports the ALJ impermissibly substitute[s] his own judgment for that of a physician; an ALJ is not free to set his own expertise against that of a physician who presents competent evidence." *Ferguson v. Schweiker,* 765 F.2d 31, 37 (3d Cir.1985); *see also Gober v. Matthews,* 574 F.2d 772, 777 (3d Cir.1978) (noting that the same principle applies in black lung cases).

In the May 29, 1998 decision, the ALJ stated that "[d]ue to the lack of support and detail in Rubio's letters and treatment notes, I give his opinion little weight," and contended that Dr. Rubio "failed to provide an adequate basis for his conclusion." (J.A. at 44). The ALJ stated the grounds for his rejection of Dr. Rubio's opinion as follows:

Dr. Rubio, in a letter dated November 9, 1995, explained why he diagnosed pneumoconiosis due to coal mining rather than chronic obstructive pulmonary disease due to smoking. He stated that he based his diagnosis "primarily on pulmonary function criteria" as the Claimant has a significant restrictive component which goes "with pneumoconiosis rather than chronic obstructive pulmonary disease." Pulmonary function studies are not diagnostic of the presence or absence of pneumoconiosis. Dr. Rubio also mentioned that the Claimant's exposure history is adequate and prolonged enough to justify the diagnosis. A history of coal dust exposure is an insufficient basis on which to make a finding of pneumoconiosis ... Dr. Rubio in a letter dated March 26, 1997, stated that ... the Claimant "has had no other significant pulmonary insult during his lifetime to merit the number on his pulmonary function test"... This statement seemingly ignores the Claimant's quadruple CABG occurring in 1993 ... Dr. Rubio also fails to explain why he discounts the Claimant's smoking history and the CABG performed in 1993.

(J.A. at 44–46) (citations omitted).

In its remand to the ALJ, the Board noted that the ALJ did not provide a valid basis for discounting Dr. Rubio's opinion. The Board noted that contrary to the ALJ's findings, a physician's opinion may be based on a pulmonary function study and a miner's employment history.[13] In addition, the Board noted that Dr. Rubio did not ignore claimant's smoking history or heart surgery. Dr. Rubio merely stated that claimant had no other "significant pulmonary insult," but noted that he understood "that there are other factors [to consider] including his previous smoking, heart disease and open heart surgery." (J.A. at 29–30).

In addition, we note that the ALJ's conclusion is also flawed in his understanding of the factual record. A review of the record indicates that Dr. Rubio did not disagree with the DOL physicians that Petitioner suffered from COPD due to smoking. In fact, four of the letters written by Dr. Rubio, contained in the record at the time of the ALJ's decision, specifically noted that Petitioner suffered from both COPD due to smoking and a restrictive component that the doctor diagnosed as pneumoconiosis caused by his coal mine employment.

It is important to note that under the statutory definition of pneumoconiosis, Petitioner is not required to demonstrate that coal dust was the *only* cause of his current respiratory problems. Petitioner need only show that he has a chronic respiratory and pulmonary impairment "significantly related to, or substantially aggravated by, dust exposure in coal mine employment." 20 C.F.R. §§ 718.201. Interpreting this section, proof that Petitioner's coal dust exposure during his mine employment contributed "at least in part" to his respiratory disease, would be sufficient. *Southard.* 732 F.2d at 71. Although none of the physicians eliminated smoking as a cause of Petitioner's impairment, Dr. Rubio opined that coal dust exposure was a cause, in part, of Petitioner's pulmonary problems, thus supporting the existence of "legal," although possibly not "medical," pneumoconiosis. *See Hobbs v. Clinchfield Coal Co.,* 45 F.3d 819, 821 (4th

---

**13.** 20 C.F.R. § 718.202(a)(4) states that a physician's finding that a miner suffers from pneumoconiosis "shall be based on objective medical evidence such as blood-gas studies, electrocardiograms, *pulmonary function studies,* physical performance tests, physical examination, and *work histories."* (Emphasis added).

Cir.1995); *Cornett v. Benham Coal, Inc.,* 227 F.3d 569, 576 (6th Cir.2000).

As to the ALJ's assessment that Dr. Rubio failed to explain why he discounted Petitioner's smoking history and heart problems, we note that Dr. Rubio provided an explanation for his opinion. In Dr. Rubio's January 4, 1996 letter, he stated that "[t]he patient did smoke in the past historically, however, restrictive patterns are more commonly seen with pneumoconiosis than with obstructive pulmonary disease," such as the COPD diagnosed by all three physicians as caused by Petitioner's history of smoking.[14] (J.A. at 58).

In the June 30, 2000 decision, the ALJ rejected Dr. Rubio's opinion on the grounds that it was inconsistent with objective clinical evidence in the x-rays. In a letter dated December 15, 1997, Dr. Rubio expressed his belief that Petitioner suffered from disabling pneumoconiosis arising from coal mine employment. Dr. Rubio stated that "[i]t is my professional opinion based on [Petitioner's] history of exposure, and based on his pulmonary function and his chest x-ray that this patient in fact has suffered long term harmful effect[s] from his history of mining." (J.A. at 54). The ALJ found that this was inconsistent and unreasoned in light of the objective evidence that Petitioner's x-rays did not show any signs of pneumoconiosis.

The mere fact that a black lung claimant's x-rays are negative and his pulmonary function studies are normal does not in itself establish that the claimant is not suffering from pneumoconiosis.[15] 30 U.S.C. §§ 923(b); *Sexton v. Dir., OWCP,* 752 F.2d 213, 215 (6th Cir.1985). As stated previously, under 20 C.F.R. § 718.202(a)(4) a physician is permitted to base his or her opinion on a number of factors, including an x-ray reading.

A review of the record reflects that the ALJ mischaracterized some of the evidence presented. In a letter dated November 9, 1995, Dr. Rubio acknowledged that Petitioner's x-ray did not show a "reticular nodular pattern," and stated that "there are cases that present as pure fibrosis and I believe that in this case this is the case." (J.A. at 60). Although the x-rays were negative for pneumoconiosis, Dr. Rubio used them as support for a finding of pure fibrosis not associated with a "reticular nodular pattern" on an x-ray. Dr. Rubio noted that the pure fibrosis represents the restrictive component of Petitioner's lung disease that Dr. Rubio opined was caused, in part, by coal dust exposure. At no time did Dr. Rubio state that the x-rays were positive. Dr. Rubio simply stated that he used them in his diagnosis, which is permitted under 20 C.F.R. § 718.202(a)(4).

---

**14.** This letter was not summarized in the ALJ's May 29, 1998 decision denying benefits and it is unclear whether this letter was considered in the ALJ's findings of fact. It is the ALJ's duty to consider all of the evidence and make findings of fact and conclusions of law which adequately set forth the factual and legal basis for his decision. *Rowe,* 710 F.2d at 254–55.

**15.** "In carrying out the provisions of this part, the Secretary shall to the maximum extent feasible (and consistent with the provisions of this part) utilize the personnel and procedures he uses in determining entitlement to disabil-

ty insurance benefit payments under section 223 of the Social Security Act, but *no claim for benefits under this part shall be denied solely on the basis of the results of a chest roentgenogram.* In determining the validity of claims under this part, all relevant evidence shall be considered, including, where relevant, medical tests such as blood gas studies, X-ray examination, electrocardiogram, pulmonary function studies, or physical performance tests, and any medical history, evidence submitted by the claimant's physician . . ." Black Lung Benefits Act of 1972, § 4(f), 30 U.S.C. § 923(b) (1982) (emphasis added).

On remand, the ALJ again did not credit the opinion of Dr. Rubio, stating in the June 30, 2000 decision that the doctor's finding of a restrictive impairment based on a loss of diffusion capacity was "inconsistent with his earlier interpretations of the pulmonary functions he performed." (J.A. at 17). Dr. Rubio expressly based his diagnosis of pneumoconiosis on a restrictive component to Petitioner's pulmonary disease as demonstrated by a "severe decrease in diffusion capacity." (J.A. at 54).

A review of the record reflects that Dr. Rubio's finding of a restrictive impairment based on a decrease in diffusion capacity was not inconsistent with the pulmonary function studies provided in the record. The ALJ found that Dr. Rubio's written notes interpreting the pulmonary function tests did not support a restrictive impairment based on a decrease in diffusion capacity. Specifically, the ALJ found that Dr. Rubio had only interpreted the studies as showing an obstructive impairment. Yet, in a letter dated May 17, 1995, Dr. Rubio stated his impression of Petitioner's condition to another physician as "COPD with an $FEV_1$ of a liter or 35% with significant hyperinflation [16] with decreased diffusion capacity," indicating that as early as May 1995, Dr. Rubio noted a decrease in diffusion capacity in his pulmonary function testing. (J.A. at 63).

Results from pulmonary function tests performed by Dr. Rubio on December 28, 1993 and October 6, 1994 also include calculations of lung diffusion.[17] In addition, pulmonary function testing performed by Dr. Raymond G. Russell on September 3, 1993 [18] also include a notation that "[a] mild restriction cannot be ruled out although this is suggested only by the vital capacity." [19] (J.A. at 92).

By concluding that the objective clinical evidence is inconsistent with decreased diffusion capacity without a supporting medical opinion, "the ALJ impermissibly substitute[ed] his own judgment for that of a physician." *Ferguson,* 765 F.2d at 37. As stated previously, "an ALJ is not free to set his own expertise against that of a physician who presents competent evidence." *Id.*

The Third Circuit in *Kertesz v. Crescent Hills Coal Co.,* 788 F.2d 158 (3rd Cir.1986) faced a similar factual situation and concluded that:

> [t]he ALJ erred by rejecting the uncontested medical opinion of Dr. Strimlan that coal related respiratory problems were not a substantial factor in Kertesz's disability. The ALJ relied on inferences he drew from the change in blood gas values between 1977 and 1979. This change was not specifically addressed by Dr. Strimlan, but at his deposition neither Kertesz nor the Director pressed Dr. Strimlan for further

16. Although Dr. Rubio notes "significant hyperinflation" in this May 17, 1995 letter, in a November 9, 1995 letter in support of his diagnosis of a restrictive lung disease Dr. Rubio stated that "[Petitioner] does not have any evidence of hyperinflation." (J.A. at 60).

17. The ALJ noted in his June 30, 2000 decision, that a "study not accompanied by three tracings may be discredited." (J.A. at 17) (citation omitted). It should be noted that these two studies which were used to calcu-

late diffusion were both accompanied by the proper tracings.

18. The ALJ, in his June 30, 2000 decision, discredits this study because it does not contain the proper tracings.

19. In the ALJ's June 30, 2000 opinion, the ALJ improperly credited this test and comment to Dr. Rubio, and used it to support his conclusion that the test results and the doctor's opinion were inconsistent.

support when he attributed Kertesz's qualifying blood gas values in the 1979 test to his continued smoking and his heart medications. Although the ALJ's reasoning in discrediting Dr. Strimlan may not be implausible, in the absence of evidence from some medical expert, the ALJ's inferences amount to nothing more than mere speculation.

788 F.2d at 163–63.

In weighing medical evidence to evaluate the reasoning and credibility of a medical expert the ALJ may not exercise "absolute discretion to credit and discredit the expert's medical evidence." *Peabody Coal Co.*, 778 F.2d at 363. We conclude that the ALJ's rejection of Dr. Rubio's opinion on grounds that it was unreasoned and inconsistent is not supported by substantial evidence in the record.

In the June 30, 2000 decision, the ALJ also rejects Dr. Rubio's opinion because the ALJ felt that the physician was equivocal about the cause of Petitioner's impairment and that the opinion was based on inaccurate histories. "An ALJ overseeing Black Lung Act claims may discredit medical expert testimony that contains equivocations about the etiology of a disease." *See Island Creek Coal Co. v. Holdman,* 202 F.3d 873, 882 (6th Cir.2000); *Griffith v. Dir., OWCP,* 49 F.3d 184, 186–87 (6th Cir.1995). Claimants for benefits under the BLBA need not prove entitlement beyond a doubt, but rather by a simple preponderance of the evidence.

To prove by a preponderance of the evidence each element of a claim before an administrative agency, the claimant must present reliable, probative, and substantial evidence of such sufficient quality and quantity that a reasonable ALJ could conclude that the existence of the facts supporting the claim are more probable than their nonexistence. *U.S. Steel Mining Co.,*

*Inc. v. Dir., OWCP,* 187 F.3d 384, 389 (4th Cir.1999).

Thus, we must review the ALJ's reading of Dr. Rubio's opinion through the prism of the "substantial evidence" standard. In light of the whole record, the evidence must be of sufficient quality and quantity " 'as a reasonable mind might accept as adequate to support' " the finding under review. *Richardson,* 402 U.S. at 401, 91 S.Ct. 1420 (citation omitted). "In referring to a singular 'reasonable mind,' the Supreme Court has noted that decisions that rest within the realm of rationality should be upheld; a reviewing court has no license to 'set aside an inference merely because it finds the opposite conclusion more reasonable or because it questions the factual basis.' " *Piney Mountain Coal Co. v. Mays,* 176 F.3d 753, 756 (4th Cir. 1999) (quoting *Smith v. Dir., OWCP,* 843 F.2d 1053, 1057 (7th Cir.1988)) and discussing *Perales,* 402 U.S. at 401, 91 S.Ct. 1420)).

"Assessment of the complexities of human health and disease defies death-and-taxes confidence, and we have noted that the 'state of medical knowledge concerning the exact consequences of prolonged exposure to coal dust' is 'uncertain.' " *Piney Mountain Coal,* 176 F.3d at 763 (citation omitted). "Of course, uncertainty is not proof, and claimants must prove entitlement." *Id.* at 763. Nevertheless, a reasoned medical opinion should not be rendered a nullity because it acknowledges the limits of modern medical opinions. "Many wise speakers choose their words carefully and conservatively, never overstating as certain an opinion that admits of any doubt, and some timid ones unnecessarily couch a sound message in noncommittal language. Still others 'believe passionately in the palpably not true,' and forgo no opportunity to share these beliefs." *Id.* at 763 (citation omitted). In

sum, the reliability of an opinion is not necessarily revealed by the forcefulness of the speaker's language.

On remand, after the Board affirmed the ALJ's determination that Petitioner had four years of coal mine experience, Dr. Rubio, in a letter dated March 1, 2000, again offered support for his opinion that Petitioner suffered from pneumoconiosis. The letter contained the following:

> Mr. McCain has been my patient for quite some time. Even though he worked in the coal mines legally for 4 years it should be noted that he did work an additional 5 years for his father before he was officially under the Social Security and Medicare system. Therefore his insult [due] to coal dust was longer than the 4 years and even if it was 4 years he still could have suffered during that time sufficient insult to result in the current impairment that I described in my previous letter.

> Therefore I do feel that [Petitioner's] disabling lung disease arose at least 50% from his coal mining days, although I do recognize that due to his previous smoking it is an additive effect but I do believe that 50% arose from his pneumoconiosis.

(J.A. at 53).

In reviewing this letter, the ALJ discredited the physician opinion as being equivocal and not based on "accurate histories." (J.A. at 17). The ALJ stated that:

> For a physician to give an opinion as to causation of a disease, it is imperative that he rely on accurate histories, even more so in cases such as this where length of smoking and coal dust exposure play such an important role in assessing the cause of a pulmonary impairment ... Dr. Rubio seemingly assumes a nine-year coal mine employment history despite my prior finding. Even if he relied on a four-year employment, his

opinion that such length of exposure "could have" been sufficient to cause the impairment is equivocal. Further, although Dr. Rubio referred to the Claimant's "previous smoking," he failed to note the *length* of the smoking history on which he relied. I have found that the Claimant has an extensive smoking history of forty-nine and one-half years.

(J.A. at 17) (emphasis in original).

The ALJ also analyzed the word "could" in Dr. Rubio's statement out of context. In his statement, Dr. Rubio stated that the four years of exposure would have been enough to cause Petitioner's impairment, although he still believed that Petitioner's exposure was longer. Although the sentence is phrased awkwardly, it does not diminish the message, especially when read in context with the rest of Dr. Rubio's letter.

From our review, when read in context with the letter's final paragraph. Dr. Rubio was not equivocal when he reiterated that Petitioner's impairment was caused at least 50% by coal dust exposure. Dr. Rubio is stating his reasoned medical opinion in terms that acknowledge that the " 'state of medical knowledge concerning the exact consequences of prolonged exposure to coal dust' is 'uncertain.' " *Piney Mountain Coal Co.*, 176 F.3d at 763. In discussing a physician's opinion the Fourth Circuit in *Piney Mountain Coal* stated:

> Dr. Stefanini's actual words (in his letter of June 25, 1991) were that pneumoconiosis "could be considered a complicating factor" in Mays's death. His use of the passive voice saps the vigor of his opinion, though not the substance, inasmuch as it is clear that he is the one doing the "considering." ... It is reasonable to read Dr. Stefanini's words as simply acknowledging the uncertainty inherent in medical opinions, while nevertheless of-

fering a positive opinion about Mays's cause of death. In the full context of his report and of the gross observations he alone made, the reasonableness of such a reading is even clearer. Dr. Stefanini was plainly impressed by both the severity of Mays's pneumoconiosis and by the respiratory failure that ushered Mays through death's door ... A reasonable reader would take them into account in assessing the intended meaning and force of the word "could."

176 F.3d at 763.

The ALJ also concludes that Dr. Rubio's opinion should be discredited because it fails to take into account "accurate histories" and fails to state the length of Petitioner's smoking history. First, Dr. Rubio does give his opinion based on the ALJ's determination of four years of coal mine employment noting that "even if [his employment] was 4 years" he still could have had sufficient exposure. (J.A. at 53).

Second, as to Dr. Rubio's failure to state the length of Petitioner's smoking history, the issue is not whether the length of the history was specifically stated in every letter Dr. Rubio wrote, but whether Dr. Rubio was aware of the specific length of Petitioner's smoking history and took it into consideration when providing his diagnosis and opinion to the Court. It is clear that Dr. Rubio was aware of Petitioner's smoking history and that it was a factor in Dr. Rubio's diagnosis. The reports from both pulmonary function studies include notations concerning Petitioner's status as a former smoker. Although Dr. Rubio's December 28, 1993 report notes that Petitioner smoked one pack a day for forty years, Dr. Rubio's October 6 1994 report stated that Petitioner had smoked two packs of cigarettes per day for forty-seven years or ninety-four pack years and had quit smoking fourteen years earlier. The

ALJ found that Petitioner's smoking history was forty-nine-and-one-half pack years.

In *Risher*, the Eighth Circuit concluded that when an opinion is based on an inaccurate history and the error is significant, the ALJ can discredit the physician's opinion.

Dr. Jewett's [diagnosis] was based on an inaccurate medical history. For example, Dr. Jewett believed that Risher had smoked cigarettes for fifteen years, whereas the evidence clearly shows that Risher had smoked for at least fifty years. An ALJ may discount a doctor's opinion where that opinion is based on an incorrect view of the claimant's medical history ... The failure to consider a claimant's smoking history renders a medical opinion suspect because a long-term smoking habit might have caused the claimant's lung problems. Because the mistake in this case was so significant, we conclude that the ALJ did not err in rejecting Dr. Jewett's diagnosis.

940 F.2d at 330–31 (citations omitted). While Dr. Rubio was aware of a ninety-four pack year smoking history, the ALJ only crediting Petitioner with a ninety-four-and-one-half pack year smoking history. Although there is a significant difference, it appears that Dr. Rubio was aware of a much lengthier history than the ALJ.

In addition, Dr. Rubio clearly considered Petitioner's smoking history as a factor in his diagnosis and recognized that Petitioner's COPD was caused by Petitioner's extensive smoking history, as stated in several of his letters.

In sum, we conclude that the treating physician's opinion was not equivocal and was based on the appropriate histories.

4. The Opinions of the DOL Physicians

It is the ALJ's duty to consider all of the evidence and make findings of fact and

conclusions of law that adequately set forth the factual and legal basis for the ruling. *Rowe*, 710 F.2d at 255. Experts' respective qualifications are important indicators of the reliability of their opinions. *Stanton v. Norfolk & W. Rwy. Co.*, 65 F.3d 55, 59 (6th Cir.1995) (noting the importance of qualifications when comparing opinions of x-ray readers); *see also Massey v. E. Assoc. Coal Corp.*, 7 BLR 1–37 (1984) (noting that the Board has recognized the highly relevant nature of physician's qualifications).

The Fourth Circuit in *Milburn Colliery Co. v. Hicks.* 138 F.3d 524 (4th Cir.1998). discussed the importance of physicians' respective qualifications:

> First, the ALJ improperly discounted the respective qualifications of the physicians. Dr. Rasmussen is board-certified in only Internal Medicine, while Dr. Zaldivar is board-certified in both Internal Medicine and Pulmonary Disease. Although the ALJ noted the relative qualifications of the two physicians, he attributed no importance to the comparative credentials of the physicians, noting their respective qualifications were "not dispositive of the issue." We have previously stated that experts' respective qualifications are important indicators of the reliability of their opinions.

138 F.3d at 536 (citations omitted).

A review of the record indicates that the ALJ never considered the respective qualifications of physicians and in fact, no curriculum vitae was entered into the record for either DOL physician. Petitioner's brief states that Dr. Fritzhand's only Board certification is in urology, a speciality greatly removed from pulmonology. Dr. Rubio's curriculum vitae was entered into the record and establishes that he is board certified in both internal medicine and the subspeciality of pulmonary medicine.

The Director asserts that the ALJ was not required to weigh Dr. Rubio's opinion on the basis of his credentials because he determined that Dr. Rubio's opinion was not credible. Although physicians' credentials may play a role in weighing the opinions of two different physicians, case law reflects that credentials are important indicators of credibility. Although there is no bright line rule requiring special consideration of the opinion of a board-certified pulmonologist without regard to the quality and credibility of the opinion, there is case law establishing that qualifications should be considered in determining the credibility of opinions entered by various physicians. *See Milburn Colliery Co.*, 138 F.3d at 536. Viewing the record as a whole, we conclude that the ALJ failed to consider the physicians' respective credentials in determining the credibility of their opinions.

We also conclude that the ALJ mischaracterized the DOL physicians' opinions as well-reasoned and well-documented. The mere statement of a conclusion by a physician, without any explanation of the basis for that statement, does not take the place of the required reasoning. As the ALJ stated in *Lango v. Director, OWCP*, 104 F.3d 573 (3rd Cir.1997), "An assertion which does not explain how the doctor reached the opinion expressed or contain his reasoning does not qualify as a reasoned medical opinion." 104 F.3d at 577.

In addition, this Circuit has noted that [t]he mere fact that an opinion is asserted to be based upon medical studies cannot by itself establish as a matter of law that it is documented and reasoned. Rather, that determination requires the factfinder to examine the validity of the reasoning of a medical opinion in light of the studies conducted and the objective indications upon which the medical opinion or conclusion is based. Of course,

the factfinder should also consider any contrary test results or diagnosis ... *Rowe,* 710 F.2d at 255.

In considering the DOL physicians' opinions, it is important to note that the reports of both doctors consist of a four-page form which includes boxes to check and spaces for narratives. When asked, on page four of the form, for "Cardiopulmonary Diagnosis(es): (And provide the basis(es) for your stated diagnosis(es).)." Dr. Burton responded by typing in "1. Chronic obstructive pulmonary disease" and "2. Arteriosclerotic heart disease." (J.A. at 72). Dr. Burton provided no basis for his diagnosis. When asked for the "Etiology of Cardiopulmonary Diagnosis(es): (List Primary and Secondary Causes-if applicable- and Provide Rationale.)." Dr. Burton responded. "1. Smoking" and "2. Life style, heredity." *Id.* He again provided no rationale for his conclusions.

When Dr. Fritzhand was prompted for his "Cardiopulmonary Diagnosis (es): (And provide the basis(es) for your stated diagnosis(es).)," the doctor responded, "1. ASMD, a. HBP, b. s/p Quadruple CABG" and "2. COPD." (J.A. at 76). Dr. Fritzhand provided no basis for his diagnosis. When asked for the "Etiology of Cardiopulmonary Diagnosis(es): (List Primary and Secondary Causesif applicable- and Provide Rationale.)," Dr. Fritzhand responded, "# 2. Exposure to cigarette smoke." *Id.* Again, Dr. Fritzhand provided no rationale for his conclusion.

In addition, both the ALJ's listing of the pulmonary function studies indicate that the pulmonary function studies reviewed by Dr. Fritzhand in his diagnosis of Petitioner's impairment were considered unacceptable by the DOL.[20] An ALJ should reject a medical opinion based on an inval-

id study. *See Dir., OWCP v. Siwiec,* 894 F.2d 635, 639 (3d Cir.1990). At the very least, it is questionable to conclude that an opinion is "well-reasoned and documented" when based on an invalid study.

Under the treating physician rule, the district court should defer to the treating physician's opinion unless there is substantial evidence in the record contradicting the opinion. Here, a review of the record reveals that: (1) the opinion of DOL physician, Dr. Fritzhand, was not based on a valid vent study; (2) the DOL physicians' opinions do not state the rationale for their conclusions; and (3) the DOL physicians do not appear to be specialists in an area of medicine relevant to black lung determinations. Thus, we conclude that there is not substantial evidence in the record to give controlling weight to the opinion of the DOL physicians, and therefore the treating physician rule applies to give controlling weight to Dr. Rubio's opinion.

## III. CONCLUSION

As previously stated, the test we apply is not whether the Board's decision is supported by substantial evidence, but whether the Board was correct in concluding that the ALJ's decision was supported by substantial evidence. *Bizzarri,* 775 F.2d at 753; *Zimmerman v. Dir., OWCP,* 871 F.2d 564, 567 (6th Cir.1989). A remand or reversal is only appropriate when the ALJ fails to consider all of the evidence under the proper legal standard or there is insufficient evidence to support the ALJ's finding. *See Cornett,* 227 F.3d at 574–75; *Rowe,* 710 F.2d at 255. As we stated in *Darland v. Fortis Benefits Ins. Co.,* 317 F.3d 516 (6th Cir.2003), when applying the treating physician rule, the ALJ should defer to the opinions of the plaintiff's treating physicians, absent "substantial ev-

---

**20.** *See supra* note 7.

idence" in the record contradicting those opinions.

In applying the treating physician rule here, Dr. Rubio's opinion should have been given controlling weight because it was well-reasoned and there was not substantial evidence in the record contradicting the treating physician's opinion.[21] Therefore, we REVERSE the Board's judgment and AWARD benefits to Petitioner.

DAVID A. NELSON, Circuit Judge, concurring in part and dissenting in part.

NELSON, Circuit Judge.

Whether the ALJ acted unreasonably in refusing to credit Dr. Rubio's opinion that Mr. McCain had pneumoconiosis is a close question, and one on which I am willing to defer to my colleagues. But if McCain established the existence of pneumoconiosis, I am not at all sure that it was impermissible for the ALJ to conclude, as he did, that McCain still could not establish that his disability was due. even in part, to such pneumoconiosis. The Benefits Review Board having found it unnecessary to reach the causation question, I would remand the case to let the Board address that issue in the first instance.

My concern about causation is informed by the following facts, among others:

— McCain should not be presumed to have had nine or ten years' exposure to coal dust, as Dr. Rubio obviously believed he should; we must take it as given that only four years' exposure could be established.

— After he left coal mining as a young man, McCain spent 40 years operating heavy equipment for an asphalt and gravel company; in that employment he was exposed to dust, gases or fumes for the entire 40 years.

— Before he gave up smoking after a heart attack in 1981, McCain had smoked the equivalent of a pack of cigarettes a day for 49 ½ years.

— Because of his arteriosclerotic heart disease, McCain underwent an angioplasty in 1981 and open heart surgery (a quadruple coronary bypass) in 1993.

That a man with this history should now be totally disabled is hardly surprising. Nor would his disability be surprising even if the man had never done a day's work in the coal industry.

When McCain saw Dr. Rubio in September of 1993. soon after the open heart surgery, Dr. Rubio diagnosed him as having, among other things, severe chronic obstructive pulmonary disease (a condition the doctor never equated with pneumoconiosis), in addition to "a very well-documented history of pneumoconiosis...." More than two years later, when asked by

---

21. Upon review of the opinion, dissenting in part, we respectfully disagree on the appropriateness of a remand. If there had been only one administrative proceeding prior to this appeal, we would agree with the dissent that this claim for benefits should be remanded to the Board for clarification of the discrepancies in Petitioner's treating physician's opinion. As the record reflects, however, the Board and the ALJ have each reviewed this claim for benefits twice prior to this appeal. This action has already been extensively considered by the ALJ and the Board. The second review by the Board and ALJ were devoted entirely to the reasoning of Dr. Rubio's opinion. We have addressed the dissent's concerns about the discrepancies in Dr. Rubio's opinion. The DOL physicians' opinions are not well-reasoned. Dr. Rubio's opinion is firmly held and documented and Dr. Rubio is well qualified in the relevant medical specialty. We conclude that Dr. Rubio's opinion is reasonable and entitled to deferential weight. In accepting Dr. Rubio's opinion, we conclude that Petitioner has pneumoconiosis caused by his coal mine employment and we award benefits to Petitioner based on this record.

McCain's lawyer how he could tell that McCain had pneumoconiosis from working as a coal miner as distinguished from chronic obstructive pulmonary disease (COPD) caused by smoking, Dr. Rubio referred to "a significant restrictive component which would certainly go with pneumoconiosis rather than COPD."[1] While acknowledging that McCain's x-rays did not demonstrate pneumoconiosis, Dr. Rubio pointed out that "there are cases that present as pure fibrosis" not visible in x-rays. McCain's was such a case, Dr. Rubio concluded: "he does not have any evidence of hyperventilation and historically I think that the exposure [to coal dust] is adequate and prolonged enough to justify the clinical diagnosis [of pneumoconiosis]."

The exposure Dr. Rubio had in mind was nine or ten years, not four years—a circumstance that, in hindsight, obviously raises a question as to the validity of the diagnosis. And Dr. Rubio's statement that McCain "does not have any evidence of hyperventilation" is inexplicable. In a note on a pulmonary function test performed in December of 1993. Dr. Rubio said that McCain's lung volumes "show marked hyperventilation." A note by Dr. Rubio interpreting an October 1994 test also speaks of "marked hyperventilation," and Dr. Rubio's report of May 17, 1995, refers to "significant hyperventilation."

In a report prepared in January of 1996, Dr. Rubio said this:

"I have already stated that in my professional opinion Mr. McCain has the diagnosis of simple pneumoconiosis based on his pulmonary function test criteria and x-ray findings which I believe supports the diagnosis of simple pneumoconiosis. "The patient did smoke in the past historically, however, restrictive patterns are more commonly seen with pneumoconiosis than with obstructive pulmonary disease."

If Dr. Rubio was suggesting here that the diagnosis was supported by "x-ray findings," among other things, he was clearly mistaken. And the mistake, if mistake it was, did not stand alone. In a report issued in September of 1996, after a hearing where McCain had been told there was insufficient proof of disability due to pneumoconiosis, Dr. Rubio expressed himself as follows:

"Mr. McCain certainly has a clear cut history of having worked the mines from 1944 to 1953 and again worked an additional 8 months later on. Clinically and *radiographically* and pulmonary function test wise my opinion without a doubt is that he has pneumoconiosis as part of his diagnosis. There is no doubt that he has other medical illnesses but I do not think that those are the main players in his shortness of breath." (Emphasis supplied.)

"Radiographically," of course, is a reference to x-rays—and the x-rays, again, were negative for pneumoconiosis.[2]

---

1. None of Dr. Rubio's earlier reports, of which there were several, mentioned this "restrictive component," although there was a reference in May of 1995 to "decreased diffusion capacity." A physician at the Kettering Medical Center, where McCain had his open heart surgery, reported the following impressions shortly before the operation:

"Severe obstructive pulmonary disease which may be related primarily to the long history of smoking. A component of revers-

ible airways changes is suggested, although this would not appear predominant. *Mild restriction cannot be ruled out, although this is suggested only by the vital capacity.*" (Emphasis supplied.)

The Kettering doctor concluded that McCain would probably not be at excessive risk from surgery.

2. In a report dated December 15, 1997, similarly, Dr. Rubio wrote that "[i]t is my professional opinion based on his history of expo-

Another reason to question Dr. Rubio's diagnosis is found in a report the doctor sent McCain's lawyer in March of 1997, after benefits had been denied on the ground that the medical evidence did not support a finding of pneumoconiosis. Writing to "basically document my disagreement with the denial of his pneumoconiosis," Dr. Rubio had this to say:

"It is my professional opinion that this attending physician and being a pulmonary specialist I do believe that clearly there is sufficient evidence of physiologic impairment and historical background to justify his disability based on pneumoconiosis. *It should be pointed out again that Mr. McCain has had no other significant pulmonary insult during his lifetime to merit the number on his pulmonary function test."* (Emphasis supplied.)

As a layman, I must say, I am at a loss to understand how a man with McCain's history could be said to have "had no other significant pulmonary insult during his lifetime . . . ." Asked about this at oral argument, McCain's lawyer readily acknowledged that Dr. Rubio's statement was less than helpful.

Somewhat more helpful to McCain, in my opinion, is the report Dr. Rubio wrote in March of 2000, after the Benefits Review Board had remanded the case to the ALJ. Given an opportunity, for the first time, to comment on the significance of the ALJ's finding that only four years of coal dust exposure could be established, Dr. Rubio said this:

"Even though he worked in the coal mines legally for 4 years it should be noted that he did work an additional 5 years for his father before he was officially under the Social Security and

sure, and based on his pulmonary function and his chest x-ray that this patient in fact has suffered long term harmful effect from his

Medicare system. Therefore his insult to coal dust was longer than the 4 years and even if it was 4 years he still could have suffered during that time sufficient insult to result in the current impairment that I described in my previous letter."

Dr. Rubio obviously disagreed with the ALJ's four-year finding, but he opined here that even four years' exposure could have caused pneumoconiosis. This was not good enough for the ALJ. who found that Dr. Rubio was being "equivocal" in stating that four years' exposure "could" have caused pneumoconiosis. The Board found no error in this respect. Eliding the question of pneumoconiosis, *vel non,* with the question of causation, the Board held that "[t]he administrative law judge ... acted within his discretion in finding that Dr. Rubio's opinion was too equivocal to support a finding of pneumoconiosis."

I am not persuaded that it was permissible to find Dr. Rubio equivocal in using the word "could" rather than "would." Dr. Rubio had said from the beginning that McCain had pneumoconiosis, among other conditions. This diagnosis was based in part on the understanding—admittedly never abandoned—that McCain had been exposed to coal dust for nine or ten years. But when asked, in effect, whether his diagnosis would change if the exposure had only lasted four years. Dr. Rubio pretty clearly intended to respond in the negative. In context, I think, his "could" had to mean "could and did."

Whether it was permissible for the ALJ to reject Dr. Rubio's diagnosis presents a much closer question, in my view. Although two consultants retained by the

history of mining during the years of 1944 to 1953."

Department of Labor—Drs. Burton and Fritzhand—disagreed with Dr. Rubio, the Board held (correctly, I believe) that the ALJ "failed to adequately consider whether the opinions of Drs. Burton and Fritzhand were sufficiently reasoned." Given this fact, and given that the record discloses nothing about the qualifications of either consultant except that each was an M.D. and Dr. Fritzhand was a Fellow of the American Academy of Disability Evaluating Physicians, whereas Dr. Rubio—the treating physician—was certified by the American Board of Internal Medicine with a pulmonary subspecialty, the Benefits Review Board was doubtless justified in declining, as it did, to give any weight to what Drs. Burton and Fritzhand said. (In any event, the Board's analysis has not been challenged in a cross-petition for review.)

The fact that the opinions of Drs. Burton and Fritzhand have been put on the shelf, however, does not mean that the opinion of Dr. Rubio must be accepted by default. Recent Sixth Circuit caselaw makes it quite clear that "there is no requirement that a treating physician's opinion be deemed controlling." *Wolf Creek Collieries v. Director, OWCP*, 298 F.3d 511, 521 (6th Cir.2002). The opinion of a treating physician deserves special consideration, to be sure, but it must still be evaluated "in light of its reasoning and documentation, other relevant evidence and the record as a whole." See *Peabody Coal Co. v. Groves*, 277 F.3d 829, 834 (6th Cir.2002) (quoting 20 C.F.R. § 718.104(d)(5)). The Board presumably applied this standard here when it held that "the administrative law judge properly found that Dr. Rubio's opinion was in-

sufficient to support a finding of pneumoconiosis."

Had I been reviewing this case as a single judge. I might not have disagreed with the Board's holding. But despite the manifest deficiencies of Dr. Rubio's explanation of the basis for his opinion—deficiencies some of which are more significant than others—Dr. Rubio's opinion is arguably a "reasoned" one, and it does represent the firmly held view of a treating physician who was well qualified in the relevant medical specialty. I shall not dissent from my colleagues' conclusion that the ALJ was required to find that McCain succeeded in showing the existence of pneumoconiosis.

Still, given the debatable quality of the evidence supporting a finding of pneumoconiosis, it seems to me that whether McCain's disability was at least in part the result of his pneumoconiosis is a question that deserves careful attention. It is entirely possible, after all, that McCain had a very mild case of coal miner's pneumoconiosis that did not contribute in any way to his disability.[3] Yet the question of causation has received no attention at all from the Benefits Review Board.

Having concluded that it was open to the ALJ to find that McCain had not established the existence of pneumoconiosis, the Board simply pretermitted the question of whether, assuming the existence of pneumoconiosis, the disease necessarily played a causative role in McCain's disability. If the disease could not be shown to have played such a role, as I understand it, McCain would not be entitled to benefits.

Given the current state of the record, I must dissent from this court's summary

---

3. Such a contingency would be consistent, I believe, with the impressions recorded by the physician at the Kettering Medical Center

who read McCain's pulmonary function report as indicating that heart surgery would not pose an excessive risk.

award of benefits. In my view, the case should be remanded to the Board with instructions to resolve the causation question.[4] Should McCain be dissatisfied with the answer ultimately given to that question, he would have every right, of course, to file another petition for review.

4. My colleagues suggest, in footnote 21 of the majority opinion, that a remand to the Board would be inappropriate because McCain's claim for benefits has already been before the Board twice. But while the Board has repeatedly reviewed the ALJ's finding as to the existence of pneumoconiosis, the salient fact is that the Board has never had to address the issue of causation. The ALJ found that pneumoconiosis, assuming its existence, could not be shown to have been a cause of McCain's disability—and that finding, if I may be forgiven for repeating myself, has never been considered by the Board at all, much less considered extensively.

My colleagues are prepared to do the Board's work for it. I am not. It seems to me that we ought to let the Board say, in the first instance, whether the ALJ could properly resolve the causation question as he did.